# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND DEPARTMENT     *
OF THE ENVIRONMENT
1800 Washington Blvd.     *
Baltimore, Maryland 21230
    *

      Plaintiff,
    *

   v.
    *

GENON CHALK POINT, LLC
2711 Centerville Rd., Suite 400     *     Civil Action No.
Wilmington, DE 19808
    *

    SERVE ON:
    THE CORPORATION TRUST     *
    INCORPORATED
    351 West Camden Street     *
    Baltimore, MD  21201
    *

AND
    *

GENON MID-ATLANTIC, LLC
2711 Centerville Rd., Suite 400     *
Wilmington, DE 19808
    *

    SERVE ON:
    THE CORPORATION TRUST     *
    INCORPORATED
    351 West Camden Street     *
    Baltimore, MD  21201
    *

      Defendants.
    *

      *    *    *    *    *    *    *    *    *

**COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES**

Plaintiff, the Maryland Department of the Environment (the "Department"), by and through its attorneys, Douglas F. Gansler, Attorney General, and Michael F. Strande, Assistant Attorney General, files this Complaint for civil penalties and injunctive relief against Defendants, GenOn Chalk Point, LLC ("GenOn Chalk Point") and GenOn Mid-Atlantic, LLC ("GenOn Mid-Atlantic") (collectively, "Defendants"), and alleges as follows:

**PRELIMINARY STATEMENT**

1.      The Department brings this civil action against Defendants, GenOn Chalk Point and GenOn Mid-Atlantic, to abate ongoing violations of state and federal water pollution laws and regulations at the Chalk Point Electric Generating Station and the Dickerson Electric Generating Station.  GenOn Chalk Point operates the Chalk Point Electric Generating Station, located at 25100 Chalk Point Road, Aquasco, Prince George's County, Maryland 20608.  GenOn Mid-Atlantic operates the Dickerson Electric Generating Station, located at 21200 Martinsburg Road, Dickerson, Montgomery County, Maryland 20842.  GenOn Mid-Atlantic is the permittee of record on the state-federal discharge permits issued to the Chalk Point Electric Generating Station and the Dickerson Electric Generating Station.

2.      In 2010, the Chalk Point and Dickerson Electric Generating Stations began experiencing problems with the biological treatment component of the systems installed to treat wastewater from the flue gas desulfurization equipment at each station.  These incidents resulted in the Chalk Point Electric Generating Station and the Dickerson Electric Generating Station

exceeding the annual total nitrogen limits established by their respective discharge permits for the 2010, 2011, 2012, and 2013 calendar years.  In addition, the Dickerson Electric Generating Station exceeded the annual total phosphorous limit established by its discharge permit for the 2011 calendar year.  The quantity and duration of these discharges present a serious danger to the environment and natural resources of the State of Maryland.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C § 1365(a).  The Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. §1367.

4.      By letter dated March 21, 2013, the Department gave notice of its intention to bring this action as required by the Clean Water Act, 33 U.S.C. § 1365, to the Administrator of the Environmental Protection Agency ("EPA"), the Attorney General of the United States, the Defendants, and the State of Maryland.  A copy of the March 21, 2013 letter is attached hereto as Exhibit 1.

5.      Sixty days have passed since the notice was served, the violations complained of in the notice letter are continuing or are reasonably likely to continue, and the Defendants remain in violation of the Clean Water Act.

6.      Venue in this District is proper pursuant to 42 U.S.C. § 6972, 28 U.S.C. § 1391(b), and 33 U.S.C. § 1365 (c)(1).

## PARTIES

7.      Plaintiff is an agency within the Executive Branch of the State of Maryland that is charged with the responsibility to protect the environment and enforce the State's environmental laws and the comprehensive state-federal scheme to protect the waters of the State and the navigable waters of the United States.  Md. Code Ann., Envir. §§ 1-401, 4-103, 5-203, and 9-302.    The Plaintiff is also a "citizen" authorized to commence a civil action under the Clean Water Act.  33 U.S.C. § 1365.

8.      Defendant GenOn Chalk Point is incorporated under the laws of Delaware and is registered to do business in the State of Maryland.[1]  GenOn Chalk Point is the operator of the Chalk Point Electrical Generating Station, and is responsible for the operation of the Chalk Point Electrical Generating Station in Prince George's County, Maryland, where certain permit and water pollution violations that are the subject of this Complaint occurred and continue to occur.

9.      Defendant GenOn Mid-Atlantic is incorporated under the laws of Delaware and is registered to do business in the State of Maryland.[2]  GenOn Mid-Atlantic is the operator of the Dickerson Electrical Generating Station, and is responsible for the operation of the Dickerson Electrical Generating Station in Montgomery County, Maryland, where certain permit and water

---

[1] On February 7, 2011, Mirant Chalk Point, L.L.C. changed its name to GenOn Chalk Point, L.L.C. by registering a name change with the Maryland Department of Assessments and Taxation.

[2] On February 7, 2011, Mirant Mid-Atlantic, L.L.C. changed its name to GenOn Mid-Atlantic, L.L.C. by registering a name change with the Maryland Department of Assessments and Taxation.

pollution violations that are the subject of this Complaint occurred and continue to occur. GenOn Mid-Atlantic is also the permittee of record for the state-federal discharge permits issue to the Chalk Point Electric Generating Station and the Dickerson Electric Generating Station, violations of which are the subject of this Complaint.

## LEGAL BACKGROUND

**A.     Federal Law**

10.     The Clean Water Act, 33 U.S.C. §§ 1251 − 1387, establishes the federal statutory framework for the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters.

11.     Section 1342(a) of the Clean Water Act requires a person to hold a National Pollutant Discharge Elimination System ("NPDES") discharge permit before discharging any pollutant into navigable waters.  Section 1311(a) makes it unlawful for any person to discharge any pollutant from a point source to navigable waters, except as in compliance with the Clean Water Act.

12.     The Clean Water Act grants citizens the authority to bring suit against "any person…alleged to be in violation" of an "effluent standard or limitation" established under the Clean Water Act and to seek penalties for such violations.  33 U.S.C. § 1365(a)(1).  "Effluent standard or limitations" means "an unlawful act under subsection (a) of section 1311 [,] … an effluent limitation or other limitation under section 1311 or 1312 [,] ... [or] a permit condition thereof issued under section 1342."  33 U.S.C. § 1365(f).  Accordingly, citizens may bring

citizen suits to enjoin the discharge of pollutants without an NPDES permit or in violation of an NPDES permit, and may seek civil penalties for such violations.

13.     The Clean Water Act provides for civil penalties of up to $37,500.00 per violation beginning January 13, 2009, and $32,500.00 per violation prior to that date.  Each day of violation constitutes a separate violation. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.  The Clean Water Act also authorizes the Court to award injunctive relief and the costs of litigation, including reasonable attorney's fees and expert witness fees.  33 U.S.C. §§ 1319(b) and 1365(a) and (d).

14.     The Administrator of the EPA may delegate issuance of NPDES discharge permits to states desiring to administer their own discharge permit programs so long as they meet the applicable criteria.  33 U.S.C. § 1342(b).

15.     The EPA has delegated authority to the State of Maryland to administer its own discharge permit program and to issue NPDES discharge permits for discharges into navigable waters within its jurisdiction.

**B.     State Law**

16.     Md. Code Ann., Envir. §§ 9-301 to 9-351 establish the statutory framework for the prevention, abatement and control of pollution of waters of the State.  Section 9-322 prohibits a person from discharging any pollutant into the waters of the State.  Section 9-323 requires a person to hold a discharge permit issued by the State before the person may construct, install, modify, extend, alter, or operate a disposal system or any other facility, if its operation could

cause or increase the discharge of pollutants into waters of the State.

17.     "Discharge" is defined as the addition, introduction, leaking, spilling or emitting of a pollutant into waters of the State; or placing a pollutant in a location where the pollutant is likely to pollute waters of the State.  Md. Code Ann., Envir. § 9-101 (b); Code of Maryland Regulations (COMAR) 26.08.01.01B.

18.     "Pollution" is defined as any contamination or other alteration of the physical, chemical or biological properties of any waters of the State, including a change in temperature, taste, color, turbidity or odor of the waters or the discharge or deposit of any organic matter, harmful organism, or liquid, gaseous, solid, radioactive, or other substance into the waters of this State, that will render the waters harmful or detrimental to: (1) public health, safety, or welfare; (2) domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses; (3) livestock, wild animals, or bird; or (4) fish or other aquatic life.  Md. Code Ann., Envir. § 9-101(h); COMAR 26.08.01.01B(67).

19.     "Waters of the state" is defined as:

(1)     Both surface and underground waters within the boundaries of this State subject to its jurisdiction, including that part of the Atlantic Ocean within the boundaries of this State, the Chesapeake Bay and its tributaries, and all ponds, lakes, river, streams, storm drain systems, public ditches, tax ditches, and public drainage systems within this State, other than those designed and used to collect, convey, or dispose of sanitary sewage; and

(2)     The floodplain of free flowing water determined by the Department on the basis of the one hundred year flood frequency.

Md. Code Ann., Envir. § 9-101(l).

20.     The Department enforces the laws pertaining to water pollution control in accordance with Md. Code Ann., Envir. §§ 9-334 through 9-344.  Section 9-339 authorizes the Department to bring actions for injunctive relief against any person who violates any provision of Title 9, Subtitle 3, of the Environment Article or any rule, regulation, or permit adopted or issued thereunder.

21.     Section 9-342(a) of the Environment Article authorizes the Court to impose civil penalties of up to $10,000.00 per violation of Title 9, Subtitle 3, or any rule, regulation, or permit adopted or issued thereunder.  Each day of violation constitutes a separate violation. Maryland law also authorizes the Court to award the Department the reasonable costs incurred in conducting environmental health monitoring or testing, including the cost of collecting and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect of a discharge on public health and the environment. Md. Code Ann., Envir. § 9-342.2.

## FACTUAL ALLEGATIONS

**A.     Chalk Point Generating Station**

22.     GenOn Chalk Point operates the Chalk Point Electric Generating Station.  The facility, in relevant part, burns coal in two supercritical steam electric generating units rated at 364 megawatts each in order to generate electric energy for commercial sale.  Operation of the Chalk Point Electric Generating Station includes the discharge of pollutants to surface waters of the Patuxent River.

8

23.     The Patuxent River is a navigable water of the United States and a water of the State of Maryland.  33 U.S.C. § 1362(7); Md. Code Ann., Envir. § 9-101(l).  It is a Use II water of the State protected for water contact recreation, fishing, aquatic life, shell fish harvesting and wildlife.  COMAR 26.08.02.08(M).

24.     In response to passage of the Maryland Healthy Air Act, the Chalk Point Electric Generating Station was required to install a flue gas desulfurization ("FGD") scrubber system, designed to remove sulfur dioxide from the air emissions of the facility's coal-fired units.  The Chalk Point Electric Generating Stations installed a wastewater treatment system to control the wastewater from the FGD system prior to its discharge to waters of the State.

25.     The FGD wastewater treatment system utilizes both chemical and biological treatment components.  The biological treatment component utilizes microbes (bacteria in the form of a sludge bed) to remove nutrients, including nitrogen and phosphorus, in the wastewater.

26.     The addition of excessive nutrients into surface waters can result in eutrophic conditions.  Eutrophication is the process where high concentrations of nutrients (especially nitrogen and phosphorus) stimulate excessive plant and algal growth.  As the plants and algae die and decompose, high levels of organic matter and decomposing organisms deplete the water of available oxygen, causing the death of other aquatic organisms (commonly referred to as "dead zones").

27.     On July 1, 2009, the Department issued State Discharge Permit 06-DP-0627, NPDES Permit MD0002658 (the "Chalk Point Discharge Permit") to GenOn Mid-Atlantic for the

discharge of pollutants associated with the operation of the Chalk Point Electric Generating Station to surface waters of the Patuxent River.

28.     The Chalk Point Discharge Permit authorizes the discharge of various industrial systems including the FGD wastewater treatment system from Outfall 001 via Monitoring Point 801 to the Patuxent River, so long as that discharge meets certain effluent limits.  At all times relevant to this Complaint, the Chalk Point Discharge Permit governed pollutant discharges from the Chalk Point Electric Generating Station.  A copy of the Chalk Point Discharge Permit is attached hereto and incorporated herein as Exhibit 2.

29.     Section I. Special Conditions, Paragraph A.5 of the Chalk Point Discharge Permit contains, *inter alia,* an annual maximum effluent limitation for total nitrogen equivalent to 329 pounds per year ("lbs/yr"), as monitored at Monitoring Point 801.

30.     Section II. General Conditions, Paragraph B.3 of the Chalk Point Discharge Permit requires that all treatment, control and monitoring facilities, or systems installed or used by the permittee, are to be maintained in good working order and operated efficiently.

31.     In or around December 2009, the FGD system (and associated wastewater treatment system) at the Chalk Point Electric Generating Station was brought on-line.

32.     Shortly after initiating operation, and at various and repeated times thereafter, the microbes in the FGD wastewater treatment system died, causing the nutrient reduction capability of the wastewater treatment system at the Chalk Point Electric Generating Station to fail.

33.    On January 20, 2010, and each day thereafter during that year, the Chalk Point Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen. According to discharge monitoring reports submitted by GenOn Chalk Point, the Chalk Point Electric Generating Station exceeded its cumulative total annual nitrogen limit by 7,229 lbs/yr in calendar year 2010.

34.    On January 21, 2011, and each day thereafter during that year, the Chalk Point Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen. According to discharge monitoring reports submitted by GenOn Chalk Point, the Chalk Point Electric Generating Station exceeded its cumulative total annual nitrogen limit by 6,563 lbs/yr in calendar year 2011.

35.    On July 16, 2012, and each day thereafter during that year, the Chalk Point Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen. According to discharge monitoring reports submitted by GenOn Chalk Point, the Chalk Point Electric Generating Station exceeded its cumulative total annual nitrogen limit by 1,941 lbs/yr in calendar year 2012.

36.    On or about January 21, 2013, the Chalk Point Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen for calendar year 2013.

37.    Defendants' inability to achieve the annual total nitrogen effluent limitations contained in the Chalk Point Discharge Permit, and their inability to consistently maintain the biologic treatment system in a functional capacity and operate in good working order the FGD

wastewater treatment system, are separate violations of the Chalk Point Discharge Permit, Section 1311 of the Clean Water Act, and Environment Article, Sections 9-322 and 9-323, Annotated Code of Maryland.

38.     Unless improvements to the generating station are made, such violations of the Chalk Point Discharge Permit and Maryland law are likely to continue.

39.     On information and belief, in 2009 and 2010 upgrades were made to the condensate polisher regeneration systems at the Chalk Point Generating Station which capture and treat approximately 5,000 lbs/yr of nitrogen containing wastewater which was previously discharged to the Patuxent River from Outfall 001 via Monitoring Point 102.

40.     The Chalk Point Discharge Permit does not authorize discharges of nitrogen to the Patuxent River from Outfall 001 via Monitoring Point 102.

**B.     Dickerson Generating Station**

41.     GenOn Mid-Atlantic operates the Dickerson Electric Generating Station.   The facility, in relevant part, burns coal in three sub-critical, steam electric generating units each rated at 182 megawatts to generate electric energy for commercial sale.  The Dickerson Electric Generating Station's operations include the discharge of pollutants to the surface waters of the Potomac River.

42.     The Potomac River is a navigable water of the United States and a water of the State of Maryland.  33 U.S.C. § 1362(7); Md. Code Ann., Envir. § 9-101(l).  It is a Use I-P water

of the State protected for water contact recreation, aquatic life, and public water supply. COMAR 26.08.02.08(O).

43.     In response to passage of the Maryland Healthy Air Act, the Dickerson Electric Generating Station was required to install a FGD scrubber system, designed to remove sulfur dioxide from the air emissions of the facility's coal-fired units.   The Dickerson Electric Generating Stations installed a wastewater treatment system to control the wastewater from the FGD system prior to its discharge to waters of the State.

44.     The FGD wastewater treatment system utilizes both chemical and biological treatment components.  The biological treatment component utilizes microbes (bacteria in the form of a sludge bed) to remove nutrients, including nitrogen and phosphorus, in the wastewater discharge.

45.     The addition of excessive nutrients into surface waters can result in eutrophic conditions.  Eutrophication is the process where high concentrations of nutrients (especially nitrogen and phosphorus) stimulate excessive plant and algal growth.  As the plants and algae die and decompose, high levels of organic matter and decomposing organisms deplete the water of available oxygen, causing the death of other aquatic organisms (commonly referred to as "dead zones").

46.     On November 1, 2009, the Department issued State Discharge Permit 06-DP-0048A, NPDES Permit MD0002640A (the "Dickerson Discharge Permit") to GenOn Mid-Atlantic for the discharge of pollutants associated with the operation of the Dickerson Electric

Generating Station to surface waters of the Potomac River.

47.     The Dickerson Discharge Permit authorizes the discharge of various industrial systems including the FGD wastewater treatment system and the facility's sewage treatment plant from Outfall 001 via Monitoring Point 801 to the Potomac River, so long as that discharge meets certain effluent limits.   At all times relevant to this Complaint, the Discharge Permit governed pollutant discharges from the Dickerson Electric Generating Station.   A copy of the Dickerson Discharge Permit is attached hereto and incorporated herein as Exhibit 3.

48.     Section I. Special Conditions, Paragraph A.5 of the Dickerson Discharge Permit contains, *inter alia,* the following effluent limitations, as monitored at Monitoring Point 801:

> i.   Annual maximum effluent limitation for total nitrogen equivalent to 511 lbs/yr; and
>
> ii.  Annual maximum effluent limitation for total phosphorus equivalent to 73 lbs/yr.

49.     Section II. General Conditions, Paragraph B.3 of the Dickerson Discharge Permit requires that all treatment, control and monitoring facilities, or systems installed or used by the permittee, are to be maintained in good working order and operated efficiently.

50.     In or around January 2010, the FGD system (and associated wastewater treatment system) at the Dickerson Electric Generating Station was brought on-line.

14

51.    Shortly after initiating operation, and at various and repeated times thereafter, the microbes in the FGD wastewater treatment system died, causing the nutrient reduction capability of the wastewater treatment system at the Dickerson Electric Generating Station to fail.

52.    On February 3, 2010, and each day thereafter during that year, the Dickerson Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen. According to discharge monitoring reports submitted by GenOn Mid-Atlantic, the Dickerson Electric Generating Station exceeded its cumulative total annual nitrogen limit by 2,639 lbs/yr in calendar year 2010.

53.    On February 17, 2011, and each day thereafter during that year, the Dickerson Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen. According to discharge monitoring reports submitted by GenOn Mid-Atlantic, the Dickerson Electric Generating Station exceeded its cumulative total annual nitrogen limit by 4,220 lbs/yr in calendar year 2011.

54.    On June 2, 2011, and each day thereafter during that year, the Dickerson Electric Generating Station exceeded its annual maximum effluent limitation for total phosphorus. According to discharge monitoring reports submitted by GenOn Mid-Atlantic, the Dickerson Electric Generating Station began exceeding its cumulative total annual phosphorus limit by 171 lbs/yr in calendar year 2011.

55.    On May 9, 2012, and each day thereafter during that year, the Dickerson Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen.

According to discharge monitoring reports submitted by GenOn Mid-Atlantic, the Dickerson Electric Generating Station exceeded its cumulative total annual nitrogen limit by 3,052 lbs/yr in calendar year 2012.

56.     On or about February 28, 2013, the Dickerson Electric Generating Station exceeded its annual maximum effluent limitation for total nitrogen for calendar year 2013.

57.     Defendant GenOn Mid-Atlantic's inability to achieve the annual total nitrogen effluent limitations contained in the Dickerson Discharge permit, and its inability to consistently maintain the biologic treatment system in a functional capacity and operate in good working order the FGD wastewater treatment system, are separate violations of the Dickerson Discharge Permit, Section 1311 of the Clean Water Act, and Environment Article, Sections 9-322 and 9-323, Annotated Code of Maryland.

58.     Unless improvements to the generating station are made, such violations of the Dickerson Discharge Permit and Maryland law are likely to continue.

**COUNT I**
**Violation of 33 U.S.C. § 1311**
**(Unauthorized Discharge of Pollutants at Chalk Point**
**to Navigable Waters of the United States)**

59.     The Department incorporates by reference the allegations set forth in paragraphs 1-58 as though fully set forth herein.

60.     Defendants have violated 33 U.S.C. § 1311 by: (1) discharging effluent from Outfall 001 (via Monitoring Point 801) at the Chalk Point Electric Generating Station to the

16

Patuxent River in excess of the Chalk Point Discharge Permit's annual maximum effluent limitation for total nitrogen of 329 lbs/yr; (2) discharging nitrogen from Outfall 001 (via Monitoring Point 102) associated with wastewater from the condensate polisher regeneration systems without a permit; and (3) discharging pollutants while the FGD wastewater treatment system was not maintained in good working order or operated efficiently, in violation of the Chalk Point Discharge Permit.

61.    Each discharge of pollutants in unauthorized amounts, from unauthorized points, or during FGD wastewater treatment system failure constitutes a separate violation of the NPDES Discharge Permit and Section 1311 of the Clean Water Act.

62.    A person who violates Section 1311 of the Clean Water Act or a Discharge Permit issued under Section 1342 of the Clean Water Act shall be subject to a civil penalty of up to $37,500.00 per violation per day beginning January 13, 2009 and $32,500.00 per violation per day prior to that date.   Each day of violation constitutes a separate violation. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

63.    The Clean Water Act also authorizes the Court to award injunctive relief and the costs of litigation, including reasonable attorney's fees and expert witness fees.  33 U.S.C. §§ 1319(b) and 1365(a) and (d).

64.    Unless enjoined by an order of the Court, violations of the Chalk Point Discharge Permit and the Clean Water Act are likely to continue.

**COUNT II**
**Violation of Md. Code Ann., Envir. §§ 9-322 and 9-323**
**(Unauthorized Discharge of Pollutants at Chalk Point to Surface Waters of the State)**

65.     The Department incorporates by reference the allegations set forth in paragraphs 1-64 as though fully set forth herein.

66.     Defendants have violated §§ 9-322 and 9323 of the Environment Article, Annotated Code of Maryland, by: (1) discharging effluent from Outfall 001 (via Monitoring Point 801) at the Chalk Point Electric Generating Station to the Patuxent River in excess of the Chalk Point Discharge Permit's annual maximum effluent limitation for total nitrogen of 329 lbs/yr; (2) discharging nitrogen associated with wastewater from the condensate polisher regeneration systems from Outfall 001 (via Monitoring Point 102) without a permit; and (3) discharging pollutants while the FGD wastewater treatment system was not maintained in good working order or operated efficiently, in violation of the Chalk Point Discharge Permit.

67.     Md. Code Ann., Envir. § 9-342(a) provides that any person who violates any provision of Title 9, Subtitle 3, or any rule, regulation, or permit adopted or issued thereunder, is liable for civil penalties of up to $10,000 per violation.  Each day a violation continues is a separate violation.

68.     Maryland law also authorizes the Court to award the Department the reasonable costs incurred in conducting environmental health monitoring or testing, including the cost of collecting and analyzing soil samples, surface water samples, or groundwater samples for the

purpose of assessing the effect of a discharge on public health and the environment. Md. Code Ann., Envir. § 9-342.2.

69.     Unless enjoined by an order of the Court, violations of the Chalk Point Discharge Permit and the Clean Water Act are likely to continue.

### COUNT III
### Violation of 33 U.S.C. § 1311
### (Unauthorized Discharge of Pollutants at Dickerson
### to Navigable Waters of the United States)

70.     The Department incorporates by reference the allegations set forth in paragraphs 1-69 as though fully set forth herein.

71.     Defendant GenOn Mid-Atlantic has violated 33 U.S.C. § 1311 by: (1) discharging effluent from Outfall 001 (via Monitoring Point 801) at the Dickerson Electric Generating Station to the Potomac River in excess of the Dickerson Discharge Permit's annual maximum effluent limitation for total nitrogen of 511 lbs/yr; (2) discharging effluent from Outfall 001 (via Monitoring Point 801) at the Dickerson Electric Generating Station to the Potomac River in excess of the Dickerson Discharge Permit's annual maximum effluent limitation for total phosphorus of 73 lbs/yr; and (3) discharging pollutants while the FGD wastewater treatment system was not maintained in good working order or operated efficiently, in violation of the Dickerson Discharge Permit.

72.    Each discharge of pollutants in unauthorized amounts, from unauthorized points, or during FGD wastewater treatment system failure constitutes a separate violation of the Dickerson Discharge Permit and Section 1311 of the Clean Water Act.

73.    A person who violates Section 1311 of the Clean Water Act or a Discharge Permit issued under Section 1342 of the Clean Water Act shall be subject to a civil penalty of up to $37,500.00 per violation per day beginning January 13, 2009 and $32,500.00 per violation per day prior to that date.   Each day of violation constitutes a separate violation. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

74.    The Clean Water Act also authorizes the Court to award injunctive relief and the costs of litigation, including reasonable attorney's fees and expert witness fees.  33 U.S.C. §§ 1319(b) and 1365(a) and (d).

75.    Unless enjoined by an order of the Court, violations of the Dickerson Discharge Permit and the Clean Water Act are likely to continue.

## COUNT IV
### Violation of Md. Code Ann., Envir. §§ 9-322 and 9-323
### (Unauthorized Discharge of Pollutants at Dickerson to Surface Waters of the State)

76.    The Department incorporates by reference the allegations set forth in paragraphs 1-75 as though fully set forth herein.

77.    Defendant GenOn Mid-Atlantic has violated §§ 9-322 and 9323 of the Environment Article, Annotated Code of Maryland, by: (1) discharging effluent from Outfall 001 (via Monitoring Point 801) at the Dickerson Electric Generating Station to the Potomac

River in excess of the Dickerson Discharge Permit's annual maximum effluent limitation for total nitrogen of 511 lbs/yr; (2) discharging effluent from Outfall 001 (via Monitoring Point 801) at the Dickerson Electric Generating Station to the Potomac River in excess of the Dickerson Discharge Permit's annual maximum effluent limitation for total phosphorus of 73 lbs/yr; and (3) discharging pollutants while the FGD wastewater treatment system was not maintained in good working order or operated efficiently, in violation of the Dickerson Discharge Permit.

78.     Md. Code Ann., Envir. § 9-342(a) provides that any person who violates any provision of Title 9, Subtitle 3, or any rule, regulation, or permit adopted or issued thereunder, is liable for civil penalties of up to $10,000 per violation.  Each day a violation continues is a separate violation.

79.     Maryland law also authorizes the Court to award the Department the reasonable costs incurred in conducting environmental health monitoring or testing, including the cost of collecting and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect of a discharge on public health and the environment. Md. Code Ann., Envir. § 9-342.2.

80.     Unless enjoined by an order of the Court, violations of the Dickerson Discharge Permit and the Clean Water Act are likely to continue.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Maryland Department of the Environment, respectfully requests that this Court enter judgment in its favor against Defendants, GenOn Chalk Point, LLC

and GenOn Mid-Atlantic, LLC, granting the following civil penalties and permanent injunctive relief:

A.      That the Court require Defendants to cease discharging any pollutants to waters of the State of Maryland from the Chalk Point Electric Generating Station which are not authorized by a NPDES/State discharge permit issued by the Department, and require Defendants to take all steps necessary to come into permanent and consistent compliance with the prohibition on unpermitted discharges contained in Section 1342(a) of the Clean Water Act and comply with Sections 9-322 and 9-323 of the Environment Article, Annotated Code of Maryland;

B.      That the Court require GenOn Mid-Atlantic, LLC to cease discharging any pollutants to waters of the State of Maryland from the Dickerson Electric Generating Station which are not authorized by a NPDES/State discharge permit issued by the Department, and require GenOn Mid-Atlantic, LLC to take all steps necessary to come into permanent and consistent compliance with the prohibition on unpermitted discharges contained in Section 1342(a) of the Clean Water Act and comply with Sections 9-322 and 9-323 of the Environment Article, Annotated Code of Maryland;

C.      That the Court order Defendants to employ a qualified professional engineer to design, build, and operate improvements to the wastewater treatment facilities at the Chalk Point and Dickerson Electric Generating Stations consistent with the recommendations found in the environmental review and engineering studies performed for Defendants and dated January 2012 and April 2013;

D.    That the Court assess civil penalties against Defendants of up to $37,500.00 per violation per day beginning January 13, 2009, and $32,500.00 per violation per day prior to that date, for each violation of Section 1311 of the Clean Water Act or a Discharge Permit issued under Section 1342 of the Clean Water Act which occurred at the Chalk Point Generating Station;

E.    That the Court assess civil penalties against GenOn Mid-Atlantic of up to $37,500.00 per violation per day beginning January 13, 2009, and $32,500.00 per violation per day prior to that date, for each violation of Section 1311 of the Clean Water Act or a Discharge Permit issued under Section 1342 of the Clean Water Act which occurred at the Dickerson Generating Station;.

F.    That the Court assess the costs of litigation, including reasonable attorney's fees and expert witness fees, against the Defendants under Section 1365(d) of the Clean Water Act;

G.    That the Court assess civil penalties against Defendants of up to $10,000.00 per violation per day pursuant to § 9-342 of the Environment Article, Annotated Code of Maryland, for each violation of § 9-322 and 9-323 which occurred at the Chalk Point Electric Generating Station;

H.    That the Court assess civil penalties against GenOn Mid-Atlantic, LLC of up to $10,000.00 per violation per day pursuant to § 9-342 of the Environment Article, Annotated Code of Maryland, for each violation of § 9-322 and 9-323 which occurred at the Dickerson Electric Generating Station;

I.      That the Court award the Department reimbursement for the costs of conducting environmental health monitoring or testing, including the cost of collecting and analyzing surface water samples, for the purpose of assessing the effect of Defendants' discharges on public health and the environment under Section 9-342.2 of the Environment Article, Annotated Code of Maryland; and

J.      That the Court award such other relief as it deems just and equitable.

Respectfully Submitted,


DOUGLAS F. GANSLER
Attorney General of Maryland


*/s/ Michael F. Strande*
MICHAEL F. STRANDE
Assistant Attorney General
Maryland Department of the Environment
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
Phone (410) 537-3421
Fax (410) 537-3943
Federal Bar No. 30039

Paul N. De Santis
Assistant Attorney General
Maryland Department of the Environment
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
Phone (410) 537-3352
Fax (410) 537-3943
Federal Bar No. 27438

Attorneys for the Maryland Department of the Environment